IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JERRY SHRUBB,                              )
                         Plaintiff,        )
                                           )        Civil Action No. 09-1013
                                           )
WARDEN, JEFFERSON COUNTY                   )
 PRISON, et al.,                           )        Magistrate Judge Kelly
                         Defendants.       )

MEMORANDUM OPINION

Plaintiff, Jerry Shrubb, an inmate incarcerated at the State Correctional Institution at

Laurel Highlands, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging various

federal and state law claims arising out of his fifteen-day confinement at the Jefferson County

Prison in August 2007.  He names two groups of defendants: 1) the warden and deputy warden

of Jefferson County Prison and John Does Correctional Officer(s)/Sergeant(s), (collectively, the

"Jefferson County Defendants"); and 2) PrimeCare Medical, Inc., Glenna Bodenhorn, R.N.,

Carrie Mitchell, L.P.N., Cynthia Stradofsky, L.P.N. and Cindy Cunningham, PA (collectively,

the "Medical Defendants").

Currently pending for disposition are two motions for summary judgment, one filed by

the Jefferson County Defendants (ECF No. 68) and the other by the Medical Defendants (ECF

No. 73).  For the reasons that follow, the motions will be granted.

I.    FACTS

This matter arises from Plaintiff's fifteen-day incarceration at Jefferson County Prison

from August 17, 2007 to September 1, 2007, while waiting transfer after receiving a six to

twelve-year prison sentence to a State Correctional Institution.  (Am. Compl. ¶¶ 11-12.)[1]  On

August 17, 2007, Plaintiff was convicted by a jury in the Court of Common Pleas of Elk County,

---

[1] ECF No. 53.

Pennsylvania of five counts of arson, burglary and receiving stolen property. (Shrubb Dep. at 55, 100;[2] Sentencing Disposition[3]; Warmbrodt Aff. ¶ 5.[4]) After being convicted, Plaintiff was detained in Elk County Prison, but was moved within hours to the Jefferson County Prison. (Shrubb Dep. at 51.) Elk County Prison did a screening of Plaintiff during intake. (ECF No. 70 Ex. C; Warmbrodt Aff. ¶¶ 6-7.)

Plaintiff claims to have mental health diagnoses of bipolar disorder and post-traumatic stress disorder ("PTSD") stemming from his being physically assaulted several years prior to the incarceration in question. He also claims to have obsessive-compulsive disorder ("OCD"). (Shrubb Dep. at 24-25, 27.) Plaintiff claims to have degenerative discs in his cervical spine that cause neck and shoulder pain. He also claims to have had temporomandibular joint disorder ("TMJ") as a result of the earlier assault. He claims that this disorder caused him to have severe headaches. (Shrubb Dep. at 25, 33.)

The Elk County Prison put Plaintiff on suicide watch with fifteen-minute checks because of his mental health problems and his sentence. (Shrubb Dep. at 101-02; ECF No. 70 Ex. D; Warmbrodt Aff. ¶ 9.) Plaintiff does not believe that Elk County Prison had a camera in his suicide watch cell. Elk County Prison did restrict the items in his cell, and gave him a quilted blanket and a smock in the "same sort of situation" as he later had at the Jefferson County Prison. (Shrubb Dep. at 102.)

When the Elk County Prison transferred Plaintiff to the Jefferson County Prison, it sent a copy of his Committing Sheet, which stated that "Inmate is on 15 min checks due to past history + his sentence." (ECF No. 70 Ex. D; Warmbrodt Aff. ¶¶ 11-12.) Plaintiff stated that having

---

[2] ECF No. 70 Ex. A.
[3] ECF No. 70 Ex. B.
[4] ECF No. 105 Ex. L.

been convicted and sentenced caused him to enter a manic state, with his mania progressing toward hallucinations. (Shrubb Dep. at 115.) When he left the Elk County Prison, he was in a manic state. (Shrubb Dep. at 111.)

Plaintiff contends that he should not have been placed on suicide watch. He cites an Intake Suicide Screening form which indicates that an inmate should be placed on suicide watch if he meets eight or more criteria, but he met only four. (ECF No. 86 Ex. A.) The Jefferson County Defendants respond that the form Plaintiff cites was a PrimeCare Medical, Inc. form and that he was placed on suicide watch by Elk County Prison not based solely on that form but also due to his past history and his sentence.

A.      Transfer to Jefferson County Prison

At 7:46 p.m. on August 17, 2007, Plaintiff was transferred to the Jefferson County Prison due to overcrowding. (Shrubb Dep. at 55-56; ECF No. 70 Ex. E; Warmbrodt Aff. ¶ 13; Pl.'s Statement Disputed Factual Issues ¶ 1;[5] Jefferson County Defs.' Resp. ¶ 1.[6]) When he was transferred, Plaintiff was still in a manic state. (Shrubb Dep. at 110.) After he arrived at the Jefferson County Prison, he was evaluated and processed. (ECF No. 70 Exs. E, F, I, J.) During his processing, Plaintiff signed a commitment sheet stating, inter alia, that he had received the Inmate Handbook. (ECF No. 70 Ex. F.) He also completed a list of visitors he wanted. (ECF No. 70 Ex. G.)

During his processing, Plaintiff was seen by an intake nurse. (Shrubb Dep. at 56.) Medical care at the Jefferson County Prison was provided by PrimeCare Medical, Inc. ("PrimeCare"), pursuant to a contract titled the Comprehensive Health Services Agreement. (ECF No. 70 Ex. H.)

---

[5] ECF No. 86.
[6] ECF No. 103.

3

At the time of his transfer from Elk County Prison to Jefferson County Prison, Plaintiff claims that health care providers had prescribed him Lamictal for his bipolar disorder, Seroquel for when he was "starting to lose touch a little bit and get aggressive," and Klonopin. For his alleged neck pain, he claims to have been prescribed Lorcet (hydrocodone). (Shrubb Dep. at 34-35.) When he was transferred, Plaintiff brought his prescription medications with him. (Shrubb Dep. at 58.) He claims that he asked the intake nurse for his narcotics (Lorcet) but the nurse said she could not give them to him until he had been seen by a doctor. (Am. Compl. ¶ 21.)

PrimeCare's records reveal that Plaintiff was given an intake assessment on August 19, 2007. (ECF No. 75 Ex. B.) The intake assessment indicates that Plaintiff received psychiatric medications. The Dispensary Card for Plaintiff indicates that he was given Lithium, Lamictal, Seroquel, and Klonopin on August 17, 2007, and for the duration of his incarceration at Jefferson County Prison. Plaintiff was also given Tylenol and Motrin for pain management. (ECF No. 75 Ex. C.) Plaintiff challenges these notations, arguing that the Dispensary Cards indicate that the medications were not ordered until August 23, 2007, that the cards list Plaintiff as receiving Motrin even after he requested that it be discontinued and that the cards suggest he was given medications by the same individual at 6:00 a.m., 8:00 a.m., 12:00 p.m. and 7:00 p.m. as if that person worked more than a thirteen-hour shift. He also argues that the fifteen-minute mental health checks document only ten instances during his incarceration at the Jefferson County Prison when he was offered his medications, as opposed to the Dispensary Cards which state that he received his medications three times a day.

A request form was available to inmates, as explained in the Inmate Handbook. (ECF No. 70 Ex. I at 3.) On the night of his arrival (August 17, 2007), he executed a request form to

"speak with a lawyer," complained about "lack of medical attention and pills" and complained "that I was transferred to Jefferson Co."  (ECF No. 70 Ex. K; Shrubb Dep. at 68-71.)

Plaintiff also submitted a sick call slip and was seen by a nurse. In that slip, he indicated that he required Lorcet or Hydrocdone for pain from degenerative disc disease and TMJ.  (ECF No. 75 Ex A.)

Between the manic state he was already in and the refusal to provide him with narcotics, Plaintiff was "agitated."  (Am. Compl. ¶ 38.)  As was the case in the Elk County Prison, Plaintiff was placed on suicide watch in the Jefferson County Prison.  His actions were recorded every fifteen minutes on check sheets.  The first notation was made at 12:05 a.m. on August 18, 2007. (ECF No. 70 Ex. J.)

Plaintiff's suicide watch cell was equipped with a video camera.  He agrees that it is possible that the lights were left on for purposes of the camera.  (Shrubb Dep. at 122.)  The cell at the Jefferson County Prison is the only cell Plaintiff remembers being in that was equipped with a video camera.  (Shrubb Dep. at 106.)

The correctional officers were checking on him every 15 minutes.  They told him that they periodically did so by watching him on the camera.  (Shrubb Dep. at 103.)  Plaintiff claims that the lights were left on at different periods during his incarceration.  However, he admits that it is possible that the lights needed to be on for purposes of the camera.  (Shrubb Dep. at 122.)

B.    August 18, 2007

On the morning of August 18, 2007, Plaintiff claims that he asked for his narcotics, and was given Tylenol.  In response, he "began pounding on his cell door with his hands and feet and began loudly shouting and singing."  He "continue[d] being annoying" because he wanted "everyone else … to suffer the same misery" as he.  (Am. Compl. ¶¶ 62-68, 79-80.)  The 15-

minute mental health checks records document that, at 11:30 a.m., Plaintiff was under his bunk and ordered to get out.  (ECF No. 70 Ex. J.)  At 3:30 p.m., he was placed in a suicide smock, also known as a "turtle suit" or a "pickle suit."  (Shrubb Dep. at 116; ECF No. 70 Ex. J.)  On that same day, Plaintiff executed a request form to add persons to his telephone lists.  (ECF No. 70 Ex. K.)

C.     August 19, 2007

On August 19, 2007, the nurse saw Plaintiff again.  He thinks he told the nurse that he was in pain and wanted his Lorcet.  The nurse told him she could not prescribe it without him being seen by the doctor.  The nurse gave him Tylenol.  (Shrubb Dep. at 64-65; Am. Compl. ¶ 89.)  He signed a form explaining how to sign up to see a doctor.  (Shrubb Dep. at 63-64.)

Plaintiff takes issue with the number of showers he received during his incarceration at the Jefferson County Prison.  (Am. Compl. ¶¶ 168-70.)  The 15-minute records document him asking for and receiving a shower at 20:00 (8:00 p.m.) on August 19, 2007.  (ECF No. 70 Ex. J.)  He acknowledges that this is "possible."  (Shrubb Dep. at 133.)

D.     August 20-21, 2007

On August 20, 2007, Plaintiff executed request forms for narcotics to both the warden and deputy warden.  (ECF No. 70 Ex. K.)  He indicated that "I have not yet received my prescribed pain pills." (ECF No. 75 Ex. A.)  Plaintiff was seen thereafter and given Motrin. Plaintiff seems to understand that narcotic pain medication can have interactions with his psychiatric prescriptions. (Am. Compl. ¶ 31.)  He wrote that he believed his medical and mental health needs were not being addressed through requested prescription medication.  (ECF No. 75 Ex. A.)  Plaintiff has admitted that he "loses touch with reality" and claims he was manic during this time.  (Am. Compl. ¶¶ 68-71, 102.)

On August 21, 2007, Plaintiff rolled up his blanket into a cylinder and began playing "stick poi" with it. (Shrubb Dep. at 116-17; Am. Compl. ¶ 102.) A female officer told him to "hand over the blanket because she believed [he] was going to harm [himself] with it[.]" (Shrubb Dep. at 117.) Plaintiff agrees that it "may have been her perception" that he was trying to commit suicide. (Shrubb Dep. at 118.) He was on suicide watch at the time. (Shrubb Dep. at 118.) He put the blanket through the 6 by 9 inch mail slot. The female officer pulled on it, but it got "jammed" in the slot. She lost her balance and slammed against the wall. (Shrubb Dep. at 119.) Officers then gave a "quick" search of his cell. Plaintiff agrees it was not unreasonable to do so. (Shrubb Dep. at 120.)

The officers found a tear on the suicide smock which, according to Plaintiff, was "threads started to come loose … sticking up" on its Velcro fasteners "which are supposed to be untearable" so that a suicidal inmate cannot use it to harm himself. They confiscated it. (Shrubb Dep. at 121.) After the suicide smock was confiscated, Plaintiff was allowed to keep his blanket. (Shrubb Dep. at 121.) Plaintiff does not know which officers were involved in this incident. The Jefferson County Prison "had a couple female officers." He does not remember what the female officer looked like. (Shrubb Dep. at 138.)

Also on August 21, 2007, he executed a request form to speak to the doctor. He wrote that he has "a medical condition that needs to be treated and looked at more carefully." (ECF No. 70 Ex. K.) On August 21, 2007, Plaintiff submitted another sick call slip asking to see a doctor (ECF No. 75 Ex. A.) Plaintiff admits that on Tuesday, August 21, 2007, he was seen by a psychologist for Jefferson County. (Am. Compl. ¶¶ 92, 174.) Plaintiff further admits that at all times he was provided Lithium. (Am. Compl. ¶ 22.) His 15-minute watch records document him being offered a shower at 10:55 a.m. (ECF No. 70 Ex. J.)

E.    August 22-23, 2007

On August 22, 2007, Plaintiff claims he continued to beat on the metal sink "as if it were a pair of drums," thinking he was Ringo Starr and was at a Beatles concert.  (Shrubb Dep. at 123; Am. Compl. ¶¶ 122-24.)  On August 23, 2007, Plaintiff claims that he had visitors at the Jefferson County Prison.  (Am. Compl. ¶ 128.)  He thinks it was with his mother, father and girlfriend, Kelly Molinari.  (Shrubb Dep. at 123, 126.)

His visits occurred in a private room with just him and his visitors, who had to come in one at a time because he was on suicide watch.  (Shrubb Dep. at 127.)  During the visits, he was covered by a blanket that was wrapped around him.  (Shrubb Dep. at 129.)

The 15-minute watch records document him having a shower at 13:49 (1:49 p.m.) on August 23, 2007.  (ECF No. 70 Ex. J.)  He acknowledges that this is "possible." (Shrubb Dep. at 133.)

F.    August 24-27, 2007

On August 24, 2007, Plaintiff began his second week at the Jefferson County Prison.  During this second week, he testified that "I was hallucinating so severely that I didn't even know I was in prison at times."  He continued, "the second week I don't even know because— because I have a hard time distinguishing reality."  (Shrubb Dep. at 125.)

On August 25, 2007, Plaintiff executed a request form for "a copy of the psych meds I take."  He also Plaintiff indicated that "I do not wish to continue taking Motrin as it doesn't help me medically… I am refusing to take meds if they aren't right." (ECF No. 75 Ex. A.)  On that same date at 20:45 (8:45 p.m.), the records document him refusing a shower.  (ECF No. 70 Ex. J.)

On August 26, 2007, he executed a form requesting Tylenol for "extreme headaches" and also asked for a muscle relaxor and anti-inflammatory and a printout sheet for the side effects of Vistrol. He was given Tylenol and the printout sheet. (ECF No. 70 Ex. K.) On August 27, 2007, he executed a request for a soft food diet and he was given a soft food diet on orders of Dr. Castellano. (ECF No. 70 Ex. K.)

G.     August 28, 2007

On August 28, 2007, at 14:15 (2:15 p.m.), he had another shower. (ECF No. 70 Ex. K.) On August 29, 2007, at 18:00 (6:00 p.m.), he had a shower. (ECF No. 70 Ex. K.) Plaintiff "question[s]" the August 28 and 29 showers because "even though I was hallucinating that severely" he had a body odor when he was transferred on September 1, 2007. (Shrubb Dep. at 133.) Defendants have submitted the affidavits of the officers who transported Plaintiff back to Elk County Prison, and they state that they have no recollection of him having a body odor or difficulty walking because of the poor condition of his feet; they indicate that they would likely remember such unusual events. (Cortina Aff. ¶¶ 4-10; Zamaroski Aff. ¶¶ 5-12.)[7]

According to Plaintiff, because he was on suicide watch, he was limited to a suicide smock, a mattress, a blanket, and the fixtures of his cell. (Shrubb Dep. at 136.) When he wanted toilet paper, he had to ask for it, and was made to wait for what was, in his opinion, "extended periods of time." (Shrubb Dep. at 136.)

H.     Toilet Incident

At one point near the end of his incarceration at the Jefferson County Prison, Plaintiff defecated on the floor despite having a toilet in his approximately 10 by 15 foot cell. (Shrubb Dep. at 137.) While he does not provide a date for this alleged incident, it would appear that this

_____

[7] ECF No. 105 Exs. M, N.

occurred on or about August 31, 2007 because his meeting with the deputy warden the day before his transfer occurred "shortly" after this alleged incident. (Compl. at 24.)[8] Plaintiff claims that even though the toilet was only a few steps away, he defecated on the floor because he had been "holding it for so long, waiting for the C.O. to return" with toilet paper. (Shrubb Dep. at 137.)

Plaintiff claims that he was "very disturbed and upset that I defecated on the floor, and the officers still didn't return with any toilet paper, so a little while later I kept asking and I still didn't get any, so I still had to finish my business." He was upset because he only had water in the sink to wash his hands, so he put his hand through the mail slot and wiped feces on the door handle. He then washed his hands in the sink. An officer came by, put his hand on the door handle and got Plaintiff's feces on his hand. (Shrubb Dep. at 138.) Shortly thereafter, the officer came back to the cell with toilet paper and soap. Plaintiff used them, then returned them to the officer. (Shrubb Dep. at 139.)

Plaintiff does not know the names of any of the correctional officers allegedly involved in the incidents described in the Amended Complaint. He thinks he would remember faces. (Shrubb Dep. at 137-38.) After the correctional officer provided the soap and toilet paper, the deputy warden came to see Plaintiff. He brought a clean blanket and a mop to clean his cell. He then took Plaintiff to speak with the Pennsylvania State Police. Plaintiff told the police everything he thought was happening. (Shrubb Dep. at 145-46.) Edward Warmbrodt, deputy warden at the Elk County Prison, states that:

> At some point prior to September 1, 2007, the Jefferson County Jail called the Elk County Prison to report that Mr. Shrubb was making claims that he was being sexually assaulted at their facility, that the Jefferson County Prison

---

[8] ECF No. 8.

contacted the Pennsylvania State Police to investigate, and that Mr. Shrubb should be moved back to the Elk County Prison.

(Warmbrodt Aff. ¶¶ 1-2, 14.)

On August 31, 2007, Plaintiff refused all of his evening medications, and he also refused his medications on September 1, 2007. (ECF No. 75 Ex. C.)

I.        Transfer to Elk County Prison

On September 1, 2007, at approximately 15:30 (3:30 p.m.), Plaintiff was transferred back to Elk County Prison. He does not know whether the deputy warden helped to facilitate that transfer. (Shrubb Dep. at 147; ECF No. 70 Ex. J; Warmbrodt Aff. ¶ 16.) Plaintiff did not get his narcotic medications at the Elk County Prison, either. (Shrubb Dep. at 53.) He has been continuously incarcerated since August 2007. (Shrubb Dep. at 31.) He indicated that he does not get narcotic pain medications in state prison because he has been weaned off of them. (Shrubb Dep. at 53.)

Plaintiff left Jefferson County Prison on September 1, 2007, with all prescribed psychiatric medications sent along to Elk County Prison. (ECF No. 75 Ex. C.) Plaintiff admits that he failed to file a grievance about his alleged inadequate medical care while at Jefferson County Prison. (Am. Compl. ¶ 10.)

The Jefferson County Defendants note that, when Plaintiff was returned to Elk County on September 1, 2007, he remained on his suicide watch status. (Warmbrodt Aff. ¶ 17.) He remained on suicide status at the Elk County Prison through September 6, 2007, when he was taken into custody by the Commonwealth of Pennsylvania to begin serving his prison sentence. (Warmbrodt Aff. ¶ 28.)

During his time at the Elk County Prison, he never asked for a grievance form to file a grievance against the Jefferson County Prison, nor did he ask for writing materials, an envelope or stamps to write to the Jefferson County Prison. (Warmbrodt Aff. ¶¶ 26-27.)

## II. PROCEDURAL HISTORY

Plaintiff initiated this action by filing a motion to proceed in forma pauperis (the "IFP Motion") on August 4, 2009 (ECF No. 1). As explained in a Memorandum Order filed by former Magistrate Judge (now District Judge) Cathy Bissoon on February 17, 2011, the IFP Motion was eventually granted (ECF No. 6) and the original Complaint was filed (ECF No. 8). However, after Plaintiff sent the IFP Motion accompanied by the original Complaint to the Clerk's Office but before the Court ruled upon the motion, Plaintiff filed a motion to amend the complaint (ECF No. 5). Magistrate Judge Amy Reynolds Hay, who had been assigned the case prior to her untimely death, denied the motion as unnecessary (ECF No. 7), given that Plaintiff had the right to file an amended complaint without leave of court since this was his first amendment and no answer had yet been filed. Unfortunately, the amended complaint was not docketed and all of the Defendants filed motions to dismiss directed at the original Complaint.

In order to correct the docket, Judge Bissoon directed the Clerk's Office to file the Amended Complaint as of December 16, 2009 and she denied the three pending motions to dismiss (ECF Nos. 24, 27, 39) as moot. The Clerk's Office docketed the Amended Complaint as directed (ECF No. 53). The Amended Complaint does not contain specific claims for relief. Rather, it consists of 214 paragraphs of factual allegations, followed by this statement:

> WHEREFORE, Plaintiff hereby moves this Honorable Court and humbly prays that it will grant Plaintiff the following relief based on the Defendant's denial of Plaintiff's constitutional right to medical care, to humane conditions of confinement, his right to be free from torture, the denial of his religious rights and the negligence, medical malpractice and intentional infliction of mental and emotional distress under Pennsylvania Law.

A. Reasonable Compensatory Damages against the Defendants jointly and severally to compensate the Plaintiff for the aforementioned Constitutional and Tort Law violations.

B. Punitive Damages against each Defendant in a reasonable amount to prevent these Defendants from wishing [to] commit such violations in the future to the Plaintiff and/or others.

C. All costs associated with this action.

D. Any and all further relief that this Honorable Court may deem appropriate.

(Am. Compl. at 33.)

On February 18, 2011, Judge Bissoon filed a Case Management Order that indicated that discovery would end by April 18, 2011, that motions for summary judgment were due by May 18, 2011, and that responses thereto were due by June 20, 2011 (ECF No. 50). However, the order did not direct the Defendants to file an answer to the Amended Complaint and the Defendants did not do so of their own accord.

In addition, rather than following Judge Bissoon's scheduled, the Defendants proceeded to file another series of motions to dismiss (ECF Nos. 51, 54, 57). Some of the Defendants also filed a motion for extension of time to extend the deadlines (ECF No. 63), which Judge Bissoon granted on April 13, 2011 (ECF No. 66), thereby setting the summary judgment deadline at July 18, 2011 and the response deadline at August 18, 2011. On June 20, 2011, the case was reassigned to the undersigned.

On July 18, 2011, a motion for summary judgment was filed by the Jefferson County Defendants, (ECF No. 68). On July 20, 2011, a motion for summary judgment was filed by the Medical Defendants, (ECF No. 73). On August 15, 2011, Plaintiff filed a motion to withdraw the action as against Prison Health Services and to join PrimeCare Medical, Inc. as the proper

defendant (ECF No. 82). On August 18, 2011, an order was entered granting this motion (ECF No. 98) and therefore the motion to dismiss that had been filed by Prison Health Services (ECF No. 54) was rendered moot. In addition, because motions for summary judgment have been filed and briefed, the other two motions to dismiss (ECF Nos. 51, 57) are also moot.

## III.    STANDARD OF REVIEW

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

## IV.    DISCUSSION

### A.    Section 1983 Claims

It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

14

secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress....

The United States Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989).

However, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." Soldal v. Cook County, Illinois, 506 U.S. 56, 70 (1992).

B.      Eighth Amendment

The Eighth Amendment protects against the infliction of "cruel and unusual punishment." U.S. Const. Amend. 8. This provision has been made applicable to the states by the Fourteenth Amendment. Robinson v. California, 370 U.S. 660 (1962). Plaintiff's claims of inadequate treatment and medical care during his incarceration at the Jefferson County Prison implicate the Eighth Amendment.

The Jefferson County Defendants argue that: 1) Plaintiff has failed to exhaust his administrative remedies, as he is required to do prior to bringing suit; 2) "Jefferson County Prison" is a building, not an entity capable of being sued, Plaintiff provides no basis for imposing liability on either the warden or deputy warden and the other "John Doe" defendants have not been identified; 3) these defendants were not responsible for making health care decisions, the

taunts he references do not rise to the level of conduct upon which liability can be applied, nor does the lack of a Bible or spiritual advisor under the circumstances of this case, and the Eighth Amendment claims are either belied by the record (which shows that he received five showers in two weeks) or insufficient to make out a claim (lack of exercise, delay in receiving toilet paper and cleaning products, taking his blanket when a concern was raised that he would injure himself with it, leaving the lights on at night while he was on suicide watch); and 4) if the supplemental claims are asserted against these defendants, they should be dismissed pursuant to § 1367(c)(3) and based on the doctrine of local immunity.

Plaintiff responds as follows: 1) he did all he could to exhaust administrative remedies by requesting a grievance form from the deputy warden, but no form was issued to him, and even if he did not do so, he had an excusable reason for this; 2) he has not named "Jefferson County Prison" as a defendant, he named the warden and deputy warden based on their personal responsibility not respondeat superior liability, and the only reason he cannot identify the John Doe defendants is because Defendants have refused to cooperate in discovery; 3) he has not charged the non-medical defendants with failure to meet his medical or mental health needs, the taunts are not cited as constitutional violations but only to show knowledge and acquiescence, he did not request an outside religious advisor but only a Bible, and whether he received five showers as Defendants contend can be resolved based on the videotape from the camera.

The Medical Defendants argue that Plaintiff's claims fail to demonstrate a deliberate indifference to a serious medical condition. They contend that the record establishes that Plaintiff was continually medicated and monitored, given a special diet and extra precautions for his mental health condition. Although he disagreed with his treatment and eventually refused to take his medication, that alone fails to demonstrate deliberate indifference.

Plaintiff responds that the Medical Defendants were well aware of his condition, but he was not seen by a psychologist for six days after his prescribed medications were denied and he received only a few "cursory" medications over an eight day period. However, the Court need not reach this issue because the exhaustion argument is dispositive.

C.     Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)(a)  The Supreme Court has held that prisoners must exhaust their administrative remedies prior to bringing suit, even if the state does not provide the kind of remedy they seek (such as monetary damages) and even if they are about excessive force.  Porter v. Nussle, 534 U.S. 516, 524-25 (2002); Booth v. Churner, 532 U.S. 731, 739 (2001); Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000).  The Court has further held that the PLRA requires "proper exhaustion," that is, exhaustion as set forth in the procedures described, in a timely manner and so on.  Woodford v. Ngo, 548 U.S. 81 (2006).

The Inmate Handbook provides a three-step process: 1) the inmate should first attempt to speak or write to staff about the grievance; 2) if the inmate chooses to file a grievance, he must submit a completed request form to the deputy warden, who will provide the grievance form; and 3) the grievance must be filed within 15 days of the event on which the claim is based.  (ECF No. 70 Ex. I at 6, § III(C).)  Plaintiff received an Inmate Handbook upon his arrival.  (ECF No. 70 Ex. F.)

In the Amended Complaint, Plaintiff admits that he filed no written grievance.  (Am. Compl. ¶ 10.)  He asserts in his Statement of Disputed Facts that he "did Exhaust Administrative

Remedies although he did not think he did at first." (ECF No. 86 ¶ 2a.) However, his only support for this contention is the Inmate Handbook (which describes the procedure as outlined above), the two Request Forms dated August 20, 2007 and pages 2-5 of his brief. On one Request Form, he checked the box for "Deputy Warden" and wrote "I would like to [receive] proper medical attention. I'm having trouble getting just plain Motrin. I have certified mental and physical problems that are not being addressed. I have TMJ and a degenerative disc disease." On the other Request Form, he checked the box for "Warden" and wrote "I wish to [receive] proper medical attention. As of yet I have not [received] my prescribed pain pills. I'm having trouble getting Aspirin or Tylenol. I have certified mental and physical problems that are not being addressed."

However, neither Request Form asks for a grievance form. Moreover, all Request Forms contain a notation that they "will be answered by the appropriate person regardless of who it is addressed to." Thus, the requests appeared to complain about a medical issue and they were answered by medical personnel. They do not demonstrate that Plaintiff exhausted his administrative remedies by requesting a grievance form and completing it.

Moreover, as noted above, the Inmate Handbook states that the grievance must be filed within 15 days of the event on which the claim is based. Even after he was transferred back to the Elk County Prison on September 1, 2007, Plaintiff took no action to file a grievance based on events at the Jefferson County Prison, which he could have done as it was still within 15 days of the events in question.

In his brief, Plaintiff cites <u>Hill v. Chalanor</u>, 419 F. Supp. 2d 255 (N.D.N.Y. 2006), to support his argument that, even if he failed to exhaust his administrative remedies, he had an excusable reason not to do so. However, in that case, the court found that the prisoner had no

excuse for failing to exhaust his remedies, even though he claimed obstruction and delay by prison authorities. He also argues that he was having a "psychotic break" and was not in his right mind. Nevertheless, he wrote completed numerous request forms while he was at Jefferson County Prison and demonstrated his ability to follow procedures.

Plaintiff contends that he and his parents made verbal complaints, but that is not what the procedures indicate. Courts have held that informal complaints do not satisfy prescribed exhaustion requirements. Ruggiero v. County of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006). Moreover, as Defendants observe, Plaintiff filed many request forms for other items (medications, a soft food diet, etc.), so he was familiar with the process, yet he failed to comply with it. This argument alone is sufficient to bar Plaintiff's claims against the Jefferson County Defendants.

The Medical Defendants refer to their Motion to Dismiss (ECF No. 51), in which they cited in their brief cited the fact that the Amended Complaint admitted that Plaintiff failed to file a written grievance (ECF No. 52 at 8) and indicated that they "continue to assert [this basis] for dismissal herein." (ECF No. 74 at 5.) Thus, they have also raised failure to exhaust as a basis for summary judgment.

Moreover, even if the Medical Defendants have not fully briefed and cited to the record to support their argument regarding Plaintiff 's failure to exhaust administrative remedies, a sua sponte grant of summary judgment in their favor is nevertheless appropriate based upon the discussion of this issue as raised by the Jefferson County Defendants and Plaintiff's response thereto. See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); DL

<u>Resources, Inc. v. FirstEnergy Solutions Corp.</u>, 506 F.3d 209, 223 (3d Cir. 2007).  In this case, Plaintiff had notice and opportunity to be heard when the Court scheduled motions for summary judgment and he specifically had notice and an opportunity to be heard with respect to the exhaustion issue in relation to the Jefferson County Defendants' motion for summary judgment, to which he replied.

Therefore, the motions for summary judgment should be granted with respect to the federal civil rights claims on the basis of Plaintiff's failure to exhaust his administrative remedies.  The remaining claims are asserted under Pennsylvania law.

      D.       <u>Supplemental Jurisdiction Over State Law Claims</u>

Plaintiff contends that he also alleges state-law torts of medical malpractice, negligence and intentional infliction of emotional distress, which the Court can maintain under the supplemental jurisdiction statute, 28 U.S.C. § 1367(a).  However, because the federal claims should be dismissed, the supplemental claims should be dismissed also.

Subsection (c) provides that a district court may, in its discretion, decline to exercise jurisdiction if any of four conditions are met.  One of these conditions is if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3).  The United States Court of Appeals for the Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995) (citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966) (other citations omitted).  The only possible consideration would be that the statutes

of limitations on Plaintiff's state law claims have expired.  However, Congress anticipated this issue and addressed it in the supplemental jurisdiction statute:

> The period of limitations for any claim asserted under section (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d).  This section ensures that Plaintiff's state law claims will not be considered time barred so long as they reassert them in state court within 30 days of the dismissal of this action.  Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000).

## V.  CONCLUSION

For the reasons set forth herein, the two motions for summary judgment will be granted, the civil rights claims will be dismissed for Plaintiff's failure to exhaust his administrative remedies and the supplemental claims will be dismissed pursuant to 28 U.S.C. § 1367(c)(3).  An appropriate order follows.

/s/ Maureen P. Kelly
MAUREEN P. KELLY
United States Magistrate Judge

Dated:  January 30, 2012

cc:    Jerry Shrubb
       HE 9060
       SCI Laurel Highlands
       PO Box 631
       5706 Glades Pike
       Somerset, PA 15501